1

2

3

4

5          UNITED STATES DISTRICT COURT

6          EASTERN DISTRICT OF WASHINGTON

7   BKWSPOKANE LLC, a Washington
    limited liability company,                NO:  12-CV-0521-TOR
8
                        Plaintiff,            ORDER ON CROSS MOTIONS FOR
9                                             SUMMARY JUDGMENT

10         v.

11  FEDERAL DEPOSIT INSURANCE
    CORPORATION, as receiver for Bank
12  of Whitman,

13                      Defendant.

14         BEFORE THE COURT is Plaintiff's Motion for Summary Judgment (ECF

15  No. 63) and Defendant's Motion for Summary Judgment (ECF No 67). This matter

16  was heard with oral argument on February 27, 2014.  Robert A. Dunn and Richard

17  T. Wetmore appeared on behalf of the Plaintiff. John H. Jamnback, Robert H.

18  Carpenter, and Lyle A. Tenpenny appeared on behalf of Defendant. The Court has

19  reviewed the briefing and the record and files herein, and is fully informed.

20  ///

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 1

BACKGROUND

This case involves a commercial building lease repudiated by the Federal Deposit Insurance Corporation after the original leaseholder, a bank, went into receivership. Plaintiff and Defendant here cross move for summary judgment on the sole remaining claim for breach of contract.

FACTS

Before its closure on August 5, 2011, Bank of Whitman ("BOW") was conducting business in several Eastern Washington locations, including the building at the center of the instant dispute, 618 West Riverside Avenue in Spokane ("the Building"). Plaintiff BKWSPOKANE ("BKW"), a Washington limited liability company, asserts that BOW had purchased the original lot for $3,877,566, which included a dilapidated structure. ECF No. 84 at 3, Pl.'s 2d Supp. SOF. That building was subsequently partially razed and a new building was constructed. *Id*. In June 2007, BKW purchased the entire building from BOW and entered into a long-term triple net lease back agreement with BOW.

The Master Commercial Lease Agreement is dated June 22, 2007, and provides in part:

1. PREMISES: Lessor does hereby lease to Lessee and Lessee leases from Lessor, those certain premises commonly known as 618 West Riverside Avenue, Spokane, WA…. This lease shall be a master lease and shall incorporate all portions of said premises, including those areas leased to others. Lessor has, or will immediately upon the commencement date hereof,

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 2

assign all of Lessor's right, title and interest in all existing leases relating to the premises to the Lessee for so long as tenant is not in default hereunder.

2. TERM: The term of this lease shall be for 25 years commencing the 22nd day of June, 2007 and shall terminate on the 30th day of June, 2032 ("Primary Term").
   …

3. RENT: Lessee's basic renal obligation shall consist of the Monthly Rent described below. Additionally, Lessee's rental obligation shall include all costs to be paid by Lessee under this lease in connection with Lessee's occupancy of the premises (such as taxes and assessments, insurance premiums, and maintenance expenses) and all costs incurred by Lessor to cure any default by Lessee.

   Lessee covenants and agrees to pay Lessor Monthly Rent in the amount of Eighty Seven Thousand Three Hundred and Seventy Five Dollars ($87,375.00) in advance, on the first day of each month to the third (3rd) anniversary date of the Primary Term…..

ECF No. 68-4, Exhibit 4, Master Commercial Lease Agreement. The first page of the lease indicates that the lease is "by and between BKWSPOKANE, LLC, a Wyoming limited liability company…and Bank of Whitman…." *Id*. On the signature page, the Lessor is noted as BKW SPOKANE, LLC, and the Master Lease is signed by Robert Samuel, President of Samuel Management, Inc., managing member of BKWSPOKANE, LLC. *Id*.

The certificate of formation for BKWSPOKANE, LLC, bearing a date of June 20, 2007, was filed with Washington's Secretary of State on June 25, 2007, and became effective that day. ECF No. 68-5, Exhibit 5, at 164-65. Contemporaneous with the formal recognition of BKWSPOKANE, LLC, the

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 3

BOW caused a statutory warranty deed to be recorded on June 25, 2007, which transferred the real property at issue to BKWSPOKANE, LLC, a Washington limited liability company. Thus, BOW became the master tenant of the entire building. From June 2007 to its closure in August 2011, BOW occupied the first floor for its banking operations, and five sub-tenants (and a licensee) occupied the other two floors.

On August 5, 2011, the Washington State Department of Financial Institutions closed the Bank of Whitman ("BOW") and appointed Defendant Federal Deposit Insurance Corporation ("FDIC") as receiver. When a state agency declares a bank insolvent and appoints the FDIC as receiver, the FDIC may, among other things, choose to liquidate the bank or sell the bank to another bank. *Federal Deposit Ins. Corp. v. Bank of Boulder*, 911 F.2d 1466, 1469 (10th Cir. 1990). Here, the FDIC chose the latter option, entering into an agreement with Columbia State Bank ("CSB") under which CSB agreed to acquire certain BOW assets and assume BOW obligations. This is called a purchase and assumption transaction.[1] Under the Purchase and Assumption Agreement ("PAA") between the FDIC and CSB, CSB agreed to acquire certain portions of BOW and was granted an option period of 90

---

[1] *See Federal Deposit Ins. Corp. v. Bank of Boulder*, 911 F.2d at 1466, for an extensive examination of P&A transactions.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 4

days to determine if it would also assume or reject certain contract and lease

obligations, including the Master Lease with over 20-years remaining on that

obligation. BKWSPOKANE, LLC is not a party to the PAA.  The PAA provides in

part:

> The Receiver hereby grants to the Assuming Institution an exclusive option
> for the period of ninety (90) days commencing the day after the Bank
> Closing Date to cause the receiver to assign to the Assuming Institution any
> or all leases for leased Bank Premises, if any, which have been continuously
> occupied by the Assuming Institution from the Bank Closing Date to the
> date it elects to accept an assignment of the leases with respect thereto to the
> extent such leases can be assigned; provided that the exercise of this option
> with respect to any lease must be as to all premises or other property subject
> to the lease. The Assuming Institution shall give notice to the Receiver
> within the option period of its election to accept or not to accept an
> assignment of any or all leases (or enter into new leases in lieu thereof). The
> Assuming Institution agrees to assume all leases assigned (or enter into new
> leases in lieu thereof) pursuant to this Section 4.6. If the Assuming
> Institution gives notice of its election not to accept an assignment of a lease
> for one or more of the leased Bank Premises within seven (7) days of the
> Bank Closing Date, then, notwithstanding any other provision of this
> Agreement to the contrary, the Assuming Institution shall not be liable for
> any of the costs or fees associated with Fair Market Value appraisals for the
> Fixtures, Furniture and Equipment located on such leased Bank Premises.

ECF No. 64-2 at 19, Exhibit B, Purchase and Assumption Agreement, Section

4.6(b). The PAA further provides:

> If the Assuming Institution elects not to accept an assignment of the lease or
> sublease any Bank Premises, the notice of such election in accordance with
> Section 4.6(b) shall specify the date upon which the Assuming Institution's
> occupancy of such leased Bank Premises shall terminate, which date shall
> not be later than ninety (90) days after the date of the Assuming Institution's
> notice not to exercise such option.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 5

1    ECF No. 64-2 at 21, Exhibit B, Purchase and Assumption Agreement.

2        On November 2, 2011, CSB notified Walter Gammage, Settlement Manager

3    of the Division of Resolutions & Receiverships at the FDIC, that it was "electing to

4    reject the master lease" on the 618 West Riverside property "due to the egregious

5    terms and conditions of the lease." ECF No. 65-1. The notification further

6    informed the FDIC that "The bank is attempting to enter into a new lease

7    agreement with Mr. Samuel (DBA BKSPOKANE, LLC) to become a tenant in the

8    existing space the bank presently occupies, but has not yet reached an agreement."

9    *Id*. On November 23, 2011, CSB notified the FDIC that "Effective February 1,

10   2012, Columbia Bank is electing to reject the master lease held on the property

11   located at 618 W Riverside Ave, Spokane, WA with an exit date of June 30, 2012."

12   ECF No. 65-3. CSB reiterated this statement in another letter dated November 28,

13   2011, adding that it "would agree to purchase the FF&E at the appraised value for

14   this location if our proposed exit date is accepted." ECF No. 65-4.  On November

15   30, 2011, CSB wrote again to Walter Gammage at the FDIC requesting an

16   extension of the option period under the PAA until June 30, 2012, this time

17   outlining the bank's rationale for the request. ECF No. 65-5. In the letter, CSB

18   notes that

19          Accepting the existing master lease for the Downtown Spokane Branch is
            not an option given the financial terms of the existing lease when compared
20          to current market rates for similar properties.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 6

1

2

3

4

The current Landlord has shown limited interest in keeping Columbia as a tenant. We have provided the landlord with a new leasing agreement and have repeatedly made requests for his response. We finally received a response on Friday, November 18th that did not reflect current marketing pricing and term, which is unacceptable to Columbia Bank. We are reaching out one more time to the landlord with our final offer. If accepted we would remain committed to this location.

5

6

7

If we cannot come to terms, we have identified an alternative site close to the current location, but Columbia would need the requested extension of the option period in order to build-out our new branch location and to minimize customer disruption.

8

9

10

Further compounding this situation is that the legacy Bank of Whitman datacenter is currently located in the 618 West Riverside building and would need to be moved before the end of January, 2012 under the P&A Agreement…. Typically datacenter moves are conducted over a six to nine month period (or longer)….

11 ECF No. 65-5. On December 2, 2011, CSB again wrote to Walter Gammage,

12 informing the FDIC of its intent to reject the Master Lease; CSB reiterated that,

13 while its vacate date (presumably under the PAA) is February 1, 2012, the bank

14 desired to stay in the property until June 30, 2012, and make all contractual lease

15 payments through that time. ECF No. 65-6. Throughout this time, CSB and BKW

16 were negotiating alternative ways for CSB to remain in the space the bank

17 occupied.

18 On February 27, 2012, the FDIC notified BKW that it was repudiating the

19 contract effective June 30, 2012. ECF No. 64-3. The letter stated:

20 The Receiver has determined that the above-referenced lease is burdensome and that disaffirmance of said lease will promote the orderly administration

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 7

of the Institution's affairs. The purpose of this letter is to inform you that the Receiver has elected to disaffirm the above-referenced lease to the full extent, if any, that it represents an enforceable obligation of the Institution or the Receiver.

ECF No. 64-3.

## DISCUSSION

### A. **Legal Standard**

Summary judgment may be granted to a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to identify specific genuine issues of material fact which must be decided by a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248. A dispute concerning any such fact is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* In ruling upon a summary judgment

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 8

1   motion, a court must construe the facts, as well as all rational inferences therefrom,

2   in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372,

3   378 (2007). Only evidence which would be admissible at trial may be considered.

4   *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

5   **B. Introduction**

6        Defendant contends that Plaintiff's breach of contract claim fails for two

7   reasons: 1) because BKW was not a party to the lease on which the claim is based,

8   and 2) because, even if BKW were a party, the FDIC was empowered to repudiate

9   the lease within a reasonable period under the Financial Institutions Reform,

10  Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. §1821(e) et seq. ECF No.

11  67 at 1. Plaintiff contends that the FDIC's repudiation was untimely under the

12  statute, and therefore Washington law governs the measure of Plaintiff's damages.

13  ECF No. 63 at 2.

14       For the reasons explained below, the Court finds that BKW was a party to

15  the lease, but the FDIC timely repudiated the lease under FIRREA.

16  **C. Whether BKW Was a Party to the Lease**

17       Defendant contends that BKW did not legally enter into the Master Lease

18  with BOW because BKW, a Washington limited liability company, was not a party

19  to the contract at the time of signing. ECF No. 67 at 9. It points out that the Master

20  Lease was signed by BKWSPOKANE, LLC, a *Wyoming* limited liability company,

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 9

on June 22, 2007, but that no such Wyoming LLC existed at the time of contracting (or at any time). *Id*.  It contends that BKWSPOKANE, a *Washington* limited liability company, came into legal existence on June 25, 2007—three days after the lease was signed.

Plaintiff counters that any reference to BKW as a Wyoming company is simply a scrivener's error, subject to reformation. BKW contends that the statutory warranty deed reveals the true intent of the contracting parties, and conveys BOW's property to BKWSPOKANE, LLC, which is a Washington limited liability company. ECF No. 73-2.  It further contends that the lease was not finalized until June 25, 2007—the date BKW was formed and then owned the subject property.

The Court finds Defendant's argument unpersuasive. BOW entered into a sale and leaseback contract with BKWSPOKANE, LLC. One scrivener's error in all of the paperwork erroneously described BKW as a Wyoming limited liability company.  That description is immaterial to the transaction and simply does not invalidate the otherwise valid lease agreement, especially since its true and proper name was used in full: BKWSPOKANE, LLC. Nor does the fact that BKW's paperwork had not yet been processed by the Secretary of State preclude it from entering into a contract effective as of the date when it both existed and when it owned the underlying property: June 25, 2007.   It is undisputed that the sale and leaseback transaction closed at the direction of the parties when BKW actually

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 10

existed as a limited liability company. In Washington, the after-acquired-interest

doctrine has been codified since before the turn of the twentieth century.  R.C.W.

64.04.070 (formerly Rem.Rev.Stat., § 10571); *see also Erickson v. Wahlheim*, 52

Wash.2d 15 (1958).  As such, it is not so much an equitable principle, as the FDIC

has argued, but rather a legal consequence, by operation of statutory law. BKW

existed on June 25, 2007, the day it effectuated the sale and leaseback transaction.

Moreover, the breach of contract claim at issue here has nothing to do with BKW's

LLC identity. The two parties who signed the sale and leaseback contract, BOW

and BKW, carried out the terms of the agreement through the transfer of title and

performance on the lease for more than four years. The contract's purpose was

only frustrated when BOW went into receivership and the FDIC repudiated the

lease. Accordingly, the FDIC's request for summary judgment on this argument is

denied.

　　　　Having found that there was a valid contract, the Court next turns to the

question of the FDIC's repudiation of that contract.

**D. Receivership, Purchase & Assumption Transactions, and the**
    **Receiver's Power to Repudiate**

　　　　Under the Financial Institutions Reform, Recovery, and Enforcement Act

("FIRREA"), the FDIC, as receiver has, *inter alia*, the authority to repudiate

///

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 11

1    contracts and leases:

2        In addition to any other rights a conservator or receiver may have, the
         conservator or receiver for any insured depository institution may disaffirm
3        or repudiate any contract or lease—

4            **(A)** to which such institution is a party;

5            **(B)** the performance of which the conservator or receiver, in the
                 conservator's or receiver's discretion, determines to be
6                burdensome; and

7            **(C)** the disaffirmance or repudiation of which the conservator or
                 receiver determines, in the conservator's or receiver's discretion,
8                will promote the orderly administration of the institution's affairs.

9    12 U.S.C. § 1821(e)(1). There are, however, limitations on the FDIC's ability to

10   repudiate, including timing:

11       The conservator or receiver appointed for any insured depository
         institution in accordance with subsection (c) of this section shall
12       determine whether or not to exercise the rights of repudiation under
         this subsection **within a reasonable period following such**
13       **appointment**.

14   12 U.S.C. §1821(e)(2) (emphasis added).

15       With some exceptions, if the FDIC repudiates under this provision its

16   liability is limited. With respect to leases under which the institution is the lessee,

17   "[i]f the conservator or receiver disaffirms or repudiates a lease under which the

18   insured depository institution was the lessee, the conservator or receiver shall not

19   be liable for any damages (other than damages determined pursuant to

20

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 12

subparagraph (B)) for the disaffirmance or repudiation of such lease." 12 U.S.C.

§ 1821(e)(4)(A).  The lessor will:

    **(i)**    be entitled to the contractual rent accruing before the later of the date—

        **(I)**    the notice of disaffirmance or repudiation is mailed; or

        **(II)** the disaffirmance or repudiation becomes effective, unless the lessor is in default or breach of the terms of the lease;

    **(ii)**    have no claim for damages under any acceleration clause or other penalty provision in the lease; and

    **(iii)** have a claim for any unpaid rent, subject to all appropriate offsets and defenses, due as of the date of the appointment which shall be paid in accordance with this subsection and subsection (i) of this section.

12 U.S.C. § 1821(e)(4)(B).

       Here, the parties do not dispute the FDIC's ability to repudiate a lease

properly, and if properly done in this case, BKW received all it was entitled under

FIRREA's limitation of liability. Rather, Plaintiff contends that the FDIC's

repudiation was improper because it was untimely; as such, it contends, the

damages provisions of FIRREA do not apply, and state law should be used to

calculate damages. Defendant FDIC contends that the statute gives it broad

discretion with respect to timeliness, and that its repudiation of the Master Lease

was therefore valid, limiting Plaintiff to damages under FIRREA.

*///*

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 13

**E. Whether the FDIC Timely Repudiated the Lease**

FIRREA gives little guidance with respect to what constitutes a "reasonable period." Several courts have stated that reasonableness depends on the circumstances of each case. *See, e.g., Resolution Trust Corp. v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1455-56 (8th Cir. 1992).[2]

Significantly, Congress did not provide a finite time period within which the receiver must repudiate a contract. "Instead, Congress granted broad discretion to [ ] the [ ] receiver." *Franklin Financial v. Resolution Trust Corp.*, 53 F.3d 268, 271-72 (9th Cir. 1995). Although at one point a ninety-day period was proposed as a time limit for a FIRREA receiver or conservator to have exercised the power to have contracts repudiated, the final statute "[i]n conformity with the Senate bill ... eliminated the express 90–day restriction" in favor of the "reasonable period" standard, "which follows the common law approach." *Resolution Trust Corp. v.*

---

[2] Many cases interpreting FIRREA involve the Resolution Trust Corp., a United States Government-owned asset management company that liquidated assets of savings and loan associations declared insolvent. The RTC ceased to exist on December 31, 1995, when all its assets and liabilities were transferred effectively to the FDIC. *See Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1370-71 (Fed. Cir. 2004).

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 14

*CedarMinn Bldg. Ltd. Partnership*, 956 F.2d at 1455 n.13 ("In conformity with the Senate bill, the final statute eliminated the express 90-day restriction, apparently concluding that RTC ought to be given some flexibility."). The plain language of the statute, especially considering the legislative history, reflects clear Congressional intent not to set a definite time period, but rather to leave the reasonableness determination to the receiver, and only then to be reviewed by the courts for unreasonableness. *See Franklin Financial v. Resolution Trust Corp.,* 53 F.3d at 273 ("We do not find a 117 day delay from appointment as receiver to announcement of repudiation to be an 'unreasonable period' under the circumstances. . . .We find in this case that the RTC's obligation in resolving the financial affairs of failed financial institutions outweighs the expectations of the landlord, FFA. We conclude that the RTC repudiated the Lease within a 'reasonable period' within the meaning of FIRREA . . . ."). *See also Deutsche Bank Nat'l Trust Co. v. F.D.I.C.,* ___F.3d ___, No. 11-56339 at slip op. 23 (9th Cir. 2014)*, citing United States v. Havelock*, 664 F.3d 1284, 1292 (9th Cir. 2012) (*en banc*) ("[W]e are not in the business of rewriting the law, but that of interpreting Congress's words when it enacted the statute. . . .").

The legislative history reveals that bankruptcy law was intended to be a model for FIRREA's receivership/conservatorship scheme. *Franklin Financial v. Resolution Trust Corp.,* 53 F.3d at 272. In bankruptcy, the "reasonable period" is

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 15

equitable in nature.  *Id.* (citing *In re GHR Energy Corp.,* 41 B.R. 668, 673 (Bankr.D.Mass. 1984) (court imposes reasonable period based on "its inherent powers of equity")).  The *Franklin* Court balanced "Congress's intention that the RTC 'conduct its operations so as to maximize recovery on assets it acquires . . . and minimize losses incurred in resolving cases' against the reasonable interests and expectations of the landlord."  *Id.* (*citing Resolution Trust Corp. v. Diamond,* 18 F.3d 111, 112 (2nd Cir.), (*quoting* S.Rep. No. 101–19, 101st Cong., 1st Sess. at 352 (1989), *vacated and remanded on other grounds sub nom.*, *Solomon v. Resolution Trust Corp.*, 513 U.S. 801 (1994)). The disaffirmance of burdensome leases should take into account the total circumstances of the lease, including whether, in the case of a sale and lease back, the lease was executed as part of an arm's length transaction. *Franklin*, 53 F.3d at 272. [3]

Not surprisingly, given the varied circumstances of each court case, there has been no consensus as to what a reasonable period of time is for repudiation.

In *Franklin*, the court used the Second Circuit's decision in *1185 Avenue of Americas Assocs. v. Resolution Trust Corp.*, 22 F.3d 494 (2d Cir. 1994) as both helpful and well reasoned.  In *1185 Avenue*, the RTC's decision to repudiate came

---

[3] "Congress specifically directed the RTC to look closely at sale-leaseback transactions such as those at issue here." *Franklin Financial v. Resolution Trust Corp.,* 53 F.3d 268, 272 (9th Cir. 1995) (citation omitted).

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 16

1    ninety days after the RTC's appointment as receiver, but almost fourteen months

2    after its appointment as conservator.  The *Franklin* Court did "not find a 117 day

3    delay from appointment as receiver to announcement of repudiation to be an

4    'unreasonable period' under the circumstances."  *Id*. at 272.  Significantly, the

5    *Franklin* Court held "the delay [wa]s not substantially greater than the ninety day

6    delay in *1185 Avenue*" and "[n]othing prevented [the plaintiff] from negotiating

7    independently with [the acquiring bank] at this time, or any time earlier."  *Id*.

8           Significantly however, Congress considered but did not adopt a 90-day limit

9    for repudiation decisions.  Accordingly, the courts are left to interpret whether

10   repudiation occurred "within a reasonable period following [ ] appointment."

11   Necessarily, such determination must be made on a case-by-case basis, considering

12   the complexities and facts presented to the situation at hand.  There is no one-size-

13   fits-all answer to the question. Courts have looked to various factors in making this

14   determination, including evidence of the receiver's bad faith, prejudice to the

15   nonrepudiating party caused by the delay, and whether delay was needless or

16   stemmed from legitimate reasons. *See New Hampshire Associates Ltd. P'ship v.

17   F.D.I.C.*, 978 F. Supp. 650, 654 (D. Md. 1997) ("Although reasonableness is to be

18   determined on the facts of each case…a number of courts have held on summary

19   judgment that periods of ninety days or more were reasonable, at least absent

20   evidence of bad faith by the RTC, or prejudice to the lessor."); and *CedarMinn*,

956 F.2d at 1454-55 (holding repudiation timely where the RTC's 24-day delay did not prejudice plaintiff).

Here, the question is not nearly as close as one could assume at first glance. The FDIC was appointed receiver on August 5, 2011. On November 2, within the 90-day period set out in the PAA, CSB notified the FDIC that it would not assume the Master Lease. ECF No. 65-1. CSB and BKW were engaged in negotiations regarding the Master Lease, various subletting arrangements, and purchase options.[4] *See* ECF No. 65-5 (November 30, 2011 letter from CSB to FDIC stating that CSB was committed to this location and had been repeatedly reaching out to BKW for a new leasing agreement). In early December, the FDIC began its formal process for documenting and acquiring the necessary approvals to repudiate the lease and honor CSB's request to vacate on June 30, 2012.  *See* ECF No. 68-6 at 7-10, 13, Deposition of David Ohlrich; ECF No. 77 at 10, Def.'s Counterstatement of Material Facts.  Through January, CSB and BKW were still negotiating a possible

_____

[4] Plaintiff contends that any negotiations with CSB were entirely unrelated to assumption of the Master Lease, and any new lease between BKW and CSB did not affect the FDIC's duty to timely repudiate. ECF No. 83 at 3. Plaintiff does not, however, dispute that it was negotiating with CSB about entering into a completely new lease arrangement.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 18

1    deal so that CSB could remain in the building, but these negotiations ultimately

2    failed. The FDIC sent its letter repudiating the lease on February 27, 2012—117

3    days after CSB notified the FDIC that it would not assume the lease, which was

4    206 days after the FDIC was appointed receiver.

5        One significant factor to consider is whether the FDIC acted in bad faith.

6    BKW argues that the FDIC took its time, did not communicate with BKW and

7    basically ginned-up its file to provide reasons for the repudiation.  *See* ECF No. 63

8    at 12. In this case, those actions do not evidence bad faith.  The FDIC has

9    satisfactorily explained that a repudiation of this size (a $22 million lease

10   extending into the year 2032) required a much higher level of authority for

11   approval, full documentation and vetting.  ECF No. 67 at 15-16. Additionally,

12   while the FDIC was not in constant communication with BKW, the FDIC was

13   fully aware that CSB was engaged in alternative or substitute lease negotiations

14   with BKW all the while. *See* ECF No. 68 at 8-9.

15       Another factor to consider is whether BKW suffered prejudice as a result of

16   the delay.  There is no evidence that BKW marketed the property, rejected other

17   lease offers, incurred expenses, or in any other manner suffered prejudice

18   attributable to the delayed repudiation.  Indeed, the uncontroverted evidence shows

19   the delay and extended tenancy by CSB actually benefited BKW because BKW

20   received some $762,000 (the contractual lease payments through June 30, 2012) it

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 19

1    would not have received had BKW signed the new proposed lease with CSB or the

2    repudiation occurred within 90 days of receivership.  *See* ECF No. 68-3, Exhibit 3

3    at 114. Further uncontroverted evidence shows the prejudice BKW suffered was

4    attributable to the general economic downturn and inability to find a replacement

5    tenant in any event, but that is not prejudice attributable to the FDIC's delay.

6         On this record, the Court finds that the FDIC's obligation in resolving the

7    financial affairs of failed institutions outweighs the unreasonable expectations of

8    BKW.  Once the acquiring bank determined that it would not assume the lease, the

9    FDIC embarked on its process of documenting and receiving the institutional

10   authority it required to repudiate the lease.  All the while BKW was freely

11   negotiating with CSB for an alternative lease.  The question is not whether the

12   FDIC's decision could have been more reasonable or more timely, but rather,

13   whether its timing was "unreasonable."  That it was not.

14   ///

15   **IT IS HEREBY ORDERED:**

16        1. Plaintiff's Motion for Summary Judgment (ECF No. 63) is **DENIED**.

17        2. Defendant's Motion for Summary Judgment (ECF No 67) is

18            **GRANTED**.

19        3. All other pending motions are denied as **MOOT** and all other hearings

20            and trial are **VACATED**.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 20

1    The District Court Executive is hereby directed to enter this Order, enter

2   Judgment for Defendant, provide copies to counsel, and **CLOSE** the file.

3       **DATED** April 2, 2014.

4



5                                          THOMAS O. RICE
                                    United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ~ 21